Canon-McMillan School District, Petitioner *v.* Commonwealth of Pennsylvania, Pennsylvania Human Relations Commission ex rel. Virginia Davis, Respondent.

Argued March 8, 1977, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*John E. Costello,* for petitioner.

*Katherine H. Fein,* Assistant General Counsel, with her *Sanford Kahn,* General Counsel, for respondent.

OPINION BY JUDGE WILKINSON, JR., April 26, 1977.
The issue in this case is whether the Pennsylvania Human Relations Commission (Commission) erred in finding that petitioner unlawfully discriminated on the basis of sex against complainant and 68 other female employees by failing to provide the same degree of contributions to their health insurance plans when they did not specify that they were "heads of households," as it did for male employees who did so specify. We find no error.

Complainant and the 68 other employees were employed by petitioner during the 1971-72 and/or the 1972-73 school years. Pursuant to a collective bargaining agreement in effect during those years, petitioner held a master hospitalization, medical and major medical insurance contract and offered each employee a choice of coverage plans thereunder. Petitioner was to make full contribution of the premiums for such plans, including "family" coverage, a designation of the insurer which included maternity benefits. On questionnaires by which each employee could select the coverage he or she desired, petitioner also asked whether the employee was a "head of household," which petitioner's superintendent explained was to be determined by how the employee had answered the inquiry for income tax purposes.[1] Petitioner then classified the employees in coverage categories based upon the responses.

Although petitioner did not question any employee's choice of coverage or designation as "head of household," petitioner also did not reveal that its degree of contribution for "family" coverage was in fact dependent upon the employee's response to the "head of household" inquiry. Petitioner paid the full premium for employees who requested "family" coverage. if they specified that they were "heads of households" and not covered by a spouse's health insurance plan, but did not pay the full premium for employees who requested such coverage and specified that they were *not* "heads of households," even though they, too, indicated that they were not covered by a spouse's plan. Instead, petitioner paid only for "single" (individual) coverage for such employees and deducted the difference between "single" and

---

[1] The record does not reveal nor do the briefs filed indicate how many of the teachers, male or female, indicated on their income tax forms whether they were heads of a household.

"family" premiums from their pay. Petitioner's rationale for this practice was that the family of an employee who did not designate himself or herself as a "head of household" was presumably covered by the health plan held elsewhere by the other spouse (*i.e.*, the "head of household") even though the employee individually was not so covered. Therefore, petitioner reasoned, any premiums it paid beyond that required for coverage of the employee alone would result in needless duplication of payments for "family" coverage (for which only one recovery could be made).[2] Petitioner did not, however, explain its practice or the significance of the "head of household" designation to the employees, even though 1971-72 was the first year in which it was to make full contribution for "family" coverage available.

Complainant requested "family" coverage and noted that her husband was self-employed and not covered by another plan. She indicated, however, that she was not a "head of household." Petitioner therefore paid only her premium for "single" coverage and deducted the "family" coverage differential. Upon discovering the deductions, complainant filed a complaint with the Commission, alleging that petitioner's practice constituted unlawful discrimination against female employees on the basis of sex in violation of Section 5(a) of the Pennsylvania Human Relations Act, Act of October 27, 1955, P.L. 744, *as amended,* 43 P.S. §955(a). An attempt at concilia-

---

[2] Had the petitioner actually administered the program based on this premise, it is doubtful if there could have been a successful sexual discrimination charge. That is to say, if all employees, both male or female, had been asked if he or she was then presently insured with family coverage and then had declined to pay the premium resulting in a double premium that did not produce double coverage, we would not have this case before us.

tion by the Commission investigator and hearing before a panel followed. Complainant testified at the hearing that she was given no guidelines or definition as to what "head of household" meant nor informed as to the significance of that designation. She stated that she did not identify herself as a "head of household" because:

> I consider my husband head of the household. To me, head of the household meant man, and I hesitated at first because at that time, I was making more money than my husband was because he was just starting out in his business. If I thought it meant on a money basis, well—in the end, I just decided to check my husband because I thought it meant man.

Petitioner's superintendent testified that the practice was not based on sex at all,[2] but rather on an employee's own voluntary response to the "head of household" inquiry, and that if complainant (or any other female employee) had specified that she was a "head of household," her "family" coverage would have been fully paid by petitioner. The panel found, however, that in actuality the result of petitioner's practice was that 78% of the female employees requesting "family" coverage had to pay the

---

[3] One witness testified that at a conciliation meeting in this case the assistant administrator of petitioner stated "that his wife could not be the head of the household because all present who were Christians should know that the Bible defines man as head of the household. The man is the one who is responsible for heading the household and that he himself had no intention of abrogating his place as head of his household as defined in this Biblical definition." Petitioner's counsel objected that this was immaterial! The record shows that the assistant administrator was at the hearing and was not called to refute this otherwise incredible statement by a senior administrator of a school district at a conciliation meeting when his school district was charged with sexual discrimination.

premium differential while none of the males requesting such coverage were so required. The panel recommended that petitioner be held in violation of Section 5(a) because:

    a. Head of household meant male and Complainant understood it to mean male; and

    b. The use of the categorization of 'head of household' had a grossly disparate effect operating against Respondent's female employes, including Complainant.

The Commission so held and ordered petitioner to cease and desist from continuing its practice and make reimbursement to complainant and the 68 female employees who had been required to pay for ''family'' coverage.[4] This appeal followed.

Petitioner's first argument is that the Commission erred as to the finding of unlawful discrimination. Petitioner contends that its rate of contribution was based not on considerations of sex, but rather on the contractual obligations between it and the insurer. In support of its contention, petitioner argues that the categories of coverage were designed by the insurer, that each employee was given complete freedom to select the coverage desired and to designate whether he or she was a ''head of household,'' that it followed the practice merely to avoid its paying for unnecessary duplicate coverage, and that the tes-

---

[4] In its "Final Order," dated June 27, 1976, the Commission ordered reimbursement to all but the complainant held in abeyance, to be effective "when and if the Pennsylvania Supreme Court upholds the Commission's authority to award affirmative relief to persons aggrieved by an unlawful discriminatory practice but who did not file complaints before the Commission." On July 6, 1976, in *Pennyslvania Human Relations Commission v. Freeport Area School District*, 467 Pa. 522, 359 A.2d 724 (1976), the Court upheld the Commission's authority to so order and the decision was included in a subsequent opinion of the Commission supporting its Final Order.

timony does not show that it ever intended "head of household" to mean "male" only.

While we note that the circumstances may not show a wrongful intent on the part of petitioner, we are compelled to affirm the decision of the Commission finding a violation of Section 5(a). In *General Electric Corporation v. Pennsylvania Human Relations Commission,* Pa. , 365 A.2d 649 (1976), our Supreme Court adopted the well-established rule of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-2(a), as promulgated by the United States Supreme Court in *Griggs v. Duke Power Co.,* 401 U.S. 424 (1971), that even employer practices which are fair in form and applied without wrongful intent are illegal if they are discriminatory in *effect,* unless justified by business necessity.

Under such a test, we cannot say that the Commission erred in its decision. The Commission found that petitioner's practice had a discriminatory effect against female employees. That finding is supported by the testimony of the Commission investigator who determined the 78:0 disparity between the respective percentages of female and male employees requesting "family" coverage who were required to contribute toward its premiums. Nor did the Commission err in finding no business necessity. While petitioner argues that its practice was dictated by contractual arrangements with its insurer, no such arrangements required it to leave its employees (especially its female employees) uninformed as to the significance of their answers to the "head of household" inquiry. In addition, though petitioner's rationale of avoiding unnecessary duplication of payments appears reasonable, it is inapplicable as to the complaint and at least six other female employees, each of whom stated on the questionnaire that while her spouse was the head of household, he did not have a health insurance

plan elsewhere by which family coverage could be obtained.

Petitioner's second argument is that the Commission lacked the authority to award affirmative relief to the 68 female employees other than complainant on the grounds that they were not parties to a complaint before the Commission. This question was resolved by the recent decision of our Supreme Court in *Pennsylvania Human Relations Commission v. Freeport Area School District, supra.* There the Court held that the Commission:

> [M]ay order affirmative relief for persons other than the named complaint when (1) the complainant alleges that such other persons have been affected by the alleged discriminatory practice and (2) such other persons entitled to relief may be described with specificity. *Id.* at 530, 359 A.2d at 728.

The Commission found that such affirmative relief was proper here under the *Freeport* test, and, once again, we cannot say that it erred. The complainant alleged that petitioner had discriminated against "female employes" by denying them the same health insurance protection granted to male employees. During investigation of the complaint, the Commission requested that petitioner furnish the names of the female employees who were affected by the allegedly discriminatory practice. Petitioner did so. In *Freeport, supra,* the Court expressly held that such action by an employer satisfies the specificity requirement.

Accordingly, we will enter the following

ORDER

Now, April 26, 1977, the order of the Pennsylvania Human Relations Commission at No. #-4562P, dated June 27, 1976, is hereby affirmed.

DISSENTING OPINION BY JUDGE MENCER:

I respectfully dissent. I cannot reconcile our holding in this case with our recent decision in *Gilman v. Unemployment Compensation Board of Review*, 28 Pa. Commonwealth Ct. 630, 369 A.2d 895 (1977), unless we have concluded that the law of this Commonwealth is that a higher standard applies to acts of private employers than to state action when determining discrimination.

The basis for the majority decision here is the utilization of federal case law that a *prima facie* violation of Title VII of the Civil Rights Act of 1964, *as amended,* 42 U.S.C. §2000e, can be established *in some circumstances,* upon proof that the effect of an otherwise facially neutral plan or classification is to discriminate against members of one class or another. *See Griggs v. Duke Power Co.,* 401 U.S. 424 (1971). The majority notes that the circumstances here may not show a wrongful intent on the part of the employer. However, it then concludes that the statistical evidence established that the test of *Griggs* had been met and "[u]nder such a test, we cannot say that the Commission erred in its decision."

My view is that expressed in *Gilman v. Unemployment Compensation Board of Review, supra,* where we stated: "While it is true that men greatly outnumber women in the favored class, numerical disparity is not alone sufficient to warrant our characterizing the classification as sex based." 28 Pa. Commonwealth Ct. at 634, 369 A.2d at 897.

Here it is significant that classifications of coverage were designated by the insurer, not the employer; that each employee was given complete freedom to select the coverage desired and to designate whether he or she held a head-of-household status, the purpose of so ascertaining being to avoid duplicate coverage. Also, the complainant testified that she did not

declare herself head of household, although she was earning more money than her husband, but "just decided to check my husband because I thought it meant man." The result that has followed is that, because *she* "thought it meant man," her *employer* has been cited and determined to be guilty of sex discrimination.

I would conclude, as we did in *Gilman,* that no invidious discrimination is present and, further, that the employer has overcome the prima facie discrimination resulting from the statistical evidence in this case by a showing that the coverage classifications here were rational ones, not established by the employer and the application of which was dependent solely upon the employee's choice.